UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

JOHAN BIJLMER, On Behalf of Himself and
All Others Similarly Situated,

                    Plaintiff,

      v.

WILDHORSE RESOURCE
DEVELOPMENT CORPORATION, JAY C.
GRAHAM, ANTHONY BAHR, BRIAN A.
BERNASEK, JONATHAN M. CLARKSON,
SCOTT A. GIESELMAN, DAVID W.
HAYES, STEPHANIE C.  HILDEBRANDT,
GRANT E. SIMS, MARTIN W. SUMNER,
and TONY R. WEBER,

                    Defendants.

-------------------------------------------------------------------

Case No._____

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

JURY TRIAL DEMANDED

      Plaintiff Johan Bijlmer ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

      1.     This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of WildHorse Resource Development Corporation ("WildHorse" or the "Company") against WildHorse and the members of WildHorse's Board of Directors (the "Board" or the "Individual Defendants"), for their violations of Sections 14(a) and 20(a) of the

1

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which WildHorse will be acquired by Chesapeake Energy Corporation ("Chesapeake") through its wholly-owned subsidiary Coleburn Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On October 30, 2018, WildHorse and Chesapeake issued a joint press release announcing they had entered into an Agreement and Plan of Merger dated October 29, 2018 ("Merger Agreement").  Pursuant to the terms of the Merger Agreement, each issued and outstanding share of WildHorse common stock will be converted into the right to receive, at the election of each WildHorse stockholder, either: (i) 5.336 shares of Chesapeake common stock and $3.00 in cash ("Mixed Consideration"), or (ii) 5.989 shares of Chesapeake common stock ("Share Consideration," together with the Mixed Consideration, the "Merger Consideration"). Based on the December 24, 2018 closing price of Chesapeake common stock, the implied value of the Mixed Consideration is $12.23 per share and the implied value of the Share Consideration is $10.36 per share.  The Proposed Transaction is valued at approximately $3.977 billion.

3.      On December 26, 2018, WildHorse filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that WildHorse stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) WildHorse's and Chesapeake's financial projections relied upon by the Company's financial advisors, Tudor Pickering Holt & Co Advisors LP ("TPH") and Morgan Stanley & Co. LLC ("Morgan Stanley" and together with TPH, the "Financial Advisors") in their financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Financial

Advisors; (iii) the background process leading to the Proposed Transaction; (iv) potential conflicts of interest faced by the Company's financial advisors; and (v) Company insiders' potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, as WildHorse stockholders need such information to cast a fully-informed vote in connection with the Proposed Transaction.

4.     In short, unless remedied, WildHorse's public stockholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction, unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants are found or are inhabitants or transact business in this District.  WildHorse's common stock

trades on the New York Stock Exchange, which is headquartered in this District, rendering venue in this District appropriate.

## PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of WildHorse.

9.     Defendant WildHorse is a Delaware corporation with its principal executive offices located at 9805 Katy Freeway, Suite 400, Houston, Texas 77024.   WildHorse is an independent oil and natural gas company focused on the acquisition, exploration, development and production of oil, natural gas and natural gas liquids ("NGLs") in East Texas.   The Company's common stock trades on the New York Stock Exchange under the ticker symbol "WRD."

10.     Defendant Jay C. Graham ("Graham") has been Chairman of the Board and Chief Executive Officer ("CEO") of the Company since 2016.   Defendant Graham was a co-founder and previously served as co-CEO of WildHorse from June 2013 to January 2016 and President of WildHorse Resources Management Company, LLC, a subsidiary of the Company's predecessor WildHorse Resources II, LLC ("WHR II"), from its formation in October 2012 to January 2016.

11.     Defendant Anthony Bahr ("Bahr") has been President and a director of the Company since August 2016.   Defendant Bahr was a co-founder and previously served as co-CEO of WHR II since June 2013.

12.     Defendant Brian A. Bernasek ("Bernasek") has been a director of the Company since June 2017.   Defendant Bernasek is also a Managing Director of The Carlyle Group (together with its affiliates, "Carlyle").

4

13.     Defendant Jonathan M. Clarkson ("Clarkson") has been a director of the Company since December 2016.

14.     Defendant Scott A. Gieselman ("Gieselman") has been a director of the Company since September 2016.  Defendant Gieselman has also served as a Partner for Natural Gas Partners ("NGP") since April 2007.

15.     Defendant David W. Hayes ("Hayes") has been a director of the Company since September 2016.  Defendant Hayes has also served as a Partner for NGP since 2008.

16.     Defendant Stephanie C. Hildebrandt ("Hildebrandt") has been a director of the Company since December 2017.

17.     Defendant Grant E. Sims ("Sims") has been a director of the Company since February 2017.

18.     Defendant Martin W. Sumner ("Sumner") has been a director of the Company since June 2017.  Defendant Sumner is a Managing Director of Carlyle.

19.     Defendant Tony R. Weber ("Weber") has been a director of the Company since September 2016.  Defendant Weber serves as Managing Partner and Chairman of the Executive Committee for NGP.

20.     Defendants identified in paragraphs 10 to 19 are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

21.     Chesapeake is an Oklahoma corporation with its principal executive offices located at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.  Chesapeake is an independent exploration and production company engaged in the acquisition, exploration and development of properties for the production of oil, natural gas and NGLs from underground

reservoirs.  Chesapeake's common stock is traded on the New York Stock Exchange under the ticker symbol "CHK."

22.    Merger Sub is a Delaware corporation and a direct, wholly owned subsidiary of Chesapeake.

23.    Carlyle, founded in 1987 in Washington, D.C., is a global alternative asset manager with $212 billion of assets under management.  Together with its affiliates, Carlyle owns approximately 24% of WildHorse common stock.

24.    NGP was founded in 1988 and has a family of private equity investment funds with over $20 billion of cumulative equity commitments organized to make direct equity investments in the energy sector.  Together with its affiliates, NGP owns approximately 44% of WildHorse common stock.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own WildHorse common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

27.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 24, 2018, there were 101,793,855 share of Company common stock outstanding.  All

members of the Class may be identified from records maintained by WildHorse or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

29.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

31.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.   Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Company Background

32.     WildHorse is engaged in the acquisition, exploitation, development and production of oil, natural gas and NGL resources.  The Company's assets are characterized by concentrated acreage positions in East Texas, and historically, North Louisiana, with multiple producing stacked pay zones, and attractive single-well rates of return.  In East Texas, WildHorse primarily targets the Eagle Ford Shale and Austin Chalk.

33.     On February 12, 2018, the Company's predecessor, WHR II, entered into a Purchase and Sale Agreement with Tanos Energy Holdings III, LLC for the sale of all of the Company's producing and non-producing oil and natural gas properties in North Louisiana, primarily located in Webster, Claiborne, Lincoln, Jackson and Ouachita Parishes for a total sale price of approximately $217.0 million (the "NLA Divestiture").  The NLA Divestiture transitioned WildHorse to a pure-play in the Eagel Ford and Austin Chalk.  In the March 29, 2018 press release announcing the closing of the NLA Divestiture, defendant Graham described the benefits of becoming a pure play, stating:

> [W]e will be able to focus entirely on our high-return Eagle Ford and Austin Chalk assets and projects such as the construction of our in-field sand mine. Furthermore, the proceeds from the North Louisiana sale and our increased borrowing base will help to fund our Eagle Ford program and bridge the gap to becoming free cash flow positive in the near future. In our 2018 program, we will extensively test various aspects of our completion design and will bring online 60% of our wells on four-well pads testing a variety of spacing assumptions. With a 404,000 net acre position, this year is about setting the groundwork on our completion and pad design in order to methodically develop this tremendous asset with over 30 years of inventory.

34.     Also on February 12, 2018, the Company announced its 2018 guidance and development plan, which included, among other things, plans to operate an average of

approximately 4.8 drilling rigs in the Eagle Ford and Austin Chalk and plans to build an in-field sand mine.

35.    On August 7, 2018, WildHorse announced its second quarter of 2018 financial results.  For the quarter, the Company's average daily production was 46.7 thousand barrels of oil equivalent per day ("Mboe/d"), a 107% increase compared to 22.6 Mboe/d in the second quarter of 2017.  WildHorse also brought online 28 gross Eagle Ford wells.  Defendant Graham commented on the quarter's financial results, stating:

> In the second quarter, WRD delivered excellent results which were amplified by the strength of our takeaway capabilities and LLS pricing. We are currently on track to meet or exceed the midpoint of our annual guidance. . . . In addition, WRD is on schedule to start our in-field sand mine by the first quarter of 2019. We have received all of the necessary permits for the mine and are in the process of installing the plants and facilities. WRD is in an enviable position with our Gulf Coast location, access to premium markets, and reduced well costs with the completion of our sand mine. We look forward to leveraging this unique position to drive full cycle returns and create value for our shareholders.

36.    In connection with its 2018 development plan, on September 11, 2018, WildHorse issued a press release announcing plans to construct an in-field oil and produced water gathering system, with expected completion in mid-2019.  According to the press release, the Company estimated the total cost of construction to be approximately $50 million, consisting of $35 million for the oil gathering system and $15 million for the produced water system. Commenting on the plan, defendant Graham was quoted as stating:

> The construction of an in-field oil and produced water gathering system will be the first phase in developing a midstream opportunity which can further improve our already superior realizations. With an in-field oil gathering system, we can reduce trucking by delivering our barrels from the wellhead to a central point in the field. . . . In addition, the oil and produced water gathering system will lower our lease operating expense on a barrel of oil equivalent basis and allows us to facilitate completions using recycled water. Within the next few months, we expect to announce the second phase of our midstream infrastructure which will include a third party long-haul pipeline that will connect to a constructed central terminal and oil gathering system in the field. WRD expects that these projects

9

will further improve our leading pricing realizations, reduce LOE, and maintain our advantaged takeaway capacity. Furthermore, WRD's in-field sand mine is set to come online earlier than expected which further improves economics benefitted by the midstream projects as well.

37.     Additionally, on September 20, 2018, the Company announced that it had recently closed two separate purchase and sale agreements to acquire a combined 20,305 net acres in the Eagle Ford, Austin Chalk, and other intervals in Texas.  As of that date, the Company had acquired approximately 31,005 net acres in 2018 for approximately $43.0 million, owning over 418,000 net acres in the Eagle Ford.  Defendant Graham commented on the announced acquisitions, stating:

The[y] are an excellent fit with our existing position. With the bolt-on of another 31,005 net acres, we continue to fill in our acreage position and increase our working interest and operational control across the field. . . . Our status as the largest player in the region allows us to acquire acreage at extremely attractive valuations. We are committed to solely consolidating the Northeast Eagle Ford and will continue to prudently add similar acreage where it makes economic sense and adds value to our shareholders.

**The Sale Process**

38.     In December 2017, Guggenheim Securities LLC ("Guggenheim") arranged a meeting between Chesapeake's CEO, Robert D. Lawler ("Lawler"), and Executive Vice President, Exploration and Production, Frank Patterson ("Patterson"), and defendant Graham to discuss a potential business combination of WildHorse and Chesapeake.  Defendant Graham subsequently discussed the matter with defendant Gieselman.  Based on Chesapeake's then-current leverage metrics, defendants Graham and Gieselman decided not to engage in further discussions at that time.

39.     During the week of June 4, 2018, defendant Graham had lunch with a business development executive of a company referred to in the Proxy Statement as "Company A," at

which the Company A executive inquired whether WildHorse would consider a potential business combination transaction with Company A.

40.     During the week of June 24, 2018, defendant Graham contacted the CEO of a company referred to in the Proxy Statement as "Company B" to inquire whether Company B would be interested in a strategic combination with WildHorse.  The Company B CEO acknowledged that Company B would be interested in such a discussion and both companies executed a mutual confidentiality agreement on July 13, 2018.

41.     On August 8, 2018, WildHorse and Chesapeake executed a confidentiality agreement.

42.     Throughout August 2018, representatives of the Company and Chesapeake held discussions regarding a potential business combination.

43.     At a September 4, 2018 Board meeting defendant Graham informed the Board that he expected to receive a non-binding offer letter from Chesapeake to acquire all of the Company's outstanding shares later in the week.  The Board discussed and confirmed that WildHorse should seek financial advisory services from Morgan Stanley, TPH and Guggenheim.

44.     On September 7, 2018, Lawler sent defendant Graham a letter proposing a stock-for-stock merger with a fixed exchange ratio of 5.25 shares of Chesapeake common stock per share of WildHorse common stock.  Chesapeake's letter further provided that the offer was non-binding and would expire at 5:00 p.m., Central Time, on September 14, 2018.

45.     On September 10, 2018, WildHorse management met with representatives of Carlyle, through its affiliate, the holder of WildHorse's outstanding preferred stock, NGP, its legal counsel, and the Company's financial advisors to discuss the terms of the initial offer by Chesapeake, next steps, timing and due diligence.

11

46.     On September 13, 2018, the Board held a meeting to discuss the proposed business combination transaction and the terms proposed by Chesapeake in the September 7, 2018 non-binding offer letter.   The Board determined that it was interested in a potential combination with Chesapeake, but required additional information regarding Chesapeake's five-year development plan and analysis by WildHorse management and the Company's financial advisors to further evaluate and consider Chesapeake's offer.

47.     On September 18, 2018, members of WildHorse management met with representatives of NGP, Morgan Stanley and TPH to discuss WildHorse's financial model and projections.

48.     Beginning on October 2, 2018, at the direction of WildHorse, the Financial Advisors contacted four publicly traded, independent exploration and production companies (including Company A) regarding their interest in a potential combination with WildHorse.

49.     On October 6, 2018, Lawler sent defendant Graham a revised exchange ratio of 5.336 Chesapeake shares per share of WildHorse common stock plus $3.00 in cash per share of WildHorse common stock, along with an option for Company stockholders to elect out of the cash portion of the consideration in favor of consideration paid entirely in Chesapeake shares, in which case any such stockholder would receive 5.989 Chesapeake shares for each share of WildHorse common stock and no cash.

50.     Over the next few weeks, the parties and their advisors finalized the terms of the combination and remaining open items of the draft merger agreement.

51.     At an October 29, 2018 Board meeting, Morgan Stanley and TPH each rendered their fairness opinions.   The Board then approved the Merger Agreement.

52.     Later that day, WildHorse and Chesapeake executed the Merger Agreement.

**The Proposed Transaction**

53.    On October 30, 2018, WildHorse and Chesapeake issued a joint press release

announcing the Proposed Transaction, which stated in relevant part:

> **OKLAHOMA CITY and HOUSTON, October 30, 2018** – Chesapeake Energy
> Corporation (NYSE:CHK) and WildHorse Resource Development Corporation
> (NYSE:WRD) today jointly announced that Chesapeake has entered into a
> definitive agreement to acquire WildHorse, an oil and gas company with
> operations in the Eagle Ford Shale and Austin Chalk formations in southeast
> Texas, in a transaction valued at approximately $3.977 billion, based on
> yesterday's closing price, including the value of WildHorse's net debt of $930
> million as of June 30, 2018. At the election of each WildHorse common
> shareholder, the consideration will consist of either 5.989 shares of Chesapeake
> common stock or a combination of 5.336 shares of Chesapeake common stock
> and $3 in cash, in exchange for each share of WildHorse common stock. The
> transaction was unanimously approved by the Board of Directors of each
> company.
>
> The acquisition of WildHorse expands Chesapeake's oil growth platform and
> accelerates progress toward its strategic and financial goals of enhancing margins,
> achieving sustainable free cash flow generation, and reducing net debt to
> EBITDA ratio.
>
> Transaction highlights and pro forma performance projections include:
>
> - **Materially Increases Oil Production/Enhances Oil Mix:** Projected to
>   double adjusted oil production by 2020 from stand-alone adjusted 2018
>   estimates, increasing to a projected range of 125,000 to 130,000 barrels (bbls)
>   of oil per day in 2019, and 160,000 to 170,000 bbls of oil per day in 2020;
>   Chesapeake's 2020 projected adjusted oil production mix is expected to
>   increase to approximately 30% of total production, compared to
>   approximately 19% today;
>
> - **Significant EBITDA Margin Accretion:** Increases projected EBITDA per
>   barrel of oil equivalent (boe) margin by approximately 35% in 2019 and by
>   approximately 50% in 2020, based on current strip prices;
>
> - **Transforms Portfolio with Expanded Oil Growth Platform:** Adds
>   approximately 420,000 high margin net acres, approximately 80 to 85% of
>   which is undeveloped, in the Eagle Ford Shale and Austin Chalk formations
>   with strategic access to premium Gulf Coast markets; addition of the
>   WildHorse asset creates an expansive oil growth platform which complements
>   Chesapeake's existing high margin Eagle Ford and Powder River Basin

positions; moving forward, Chesapeake expects over 80% of future drilling and completion activity will be directed toward high-margin oil opportunities.

- **Substantial Cost Savings:** $200 to $280 million in projected average annual savings, totaling $1 to $1.5 billion by 2023, due to operational and capital efficiencies as a result of Chesapeake's significant expertise with unconventional assets and technical and operational excellence; incremental savings through elimination of redundant corporate overhead, gathering, processing and transmission synergies and improved capital markets execution due to improved credit metrics;

- **Accelerates Deleveraging:** Transaction will accelerate progress toward goal of 2.0x net debt to EBITDA ratio; improves projected 2019 net debt to EBITDA ratio to approximately 3.6x and projected 2020 net debt to EBITDA ratio to approximately 2.8x, based on current strip prices.

Doug Lawler, Chesapeake's President and Chief Executive Officer, stated, "This transaction accelerates Chesapeake's strategic plan and expands the value-creation opportunities for our shareholders by adding a premier asset at an attractive valuation, significantly boosting oil production, EBITDA margins and cash flow growth, while improving our leverage metrics. The addition of WildHorse, together with our substantial growth profile in the Powder River Basin, advances our transformation into a highly competitive company with a diverse portfolio of high-quality assets, a stronger balance sheet and meaningful oil-growth potential."

* * *

Upon closing, Chesapeake shareholders will own approximately 55% of the combined company, and WildHorse shareholders will own approximately 45%, depending on the consideration elected. Prior to closing, WildHorse will designate two individuals, presently expected to be Jay Graham and current WildHorse Director David Hayes to be added to Chesapeake's Board of Directors. R. Brad Martin and Doug Lawler will continue to serve as Chesapeake's Chairman of the Board of Directors and President, Chief Executive Officer and Director, respectively.

**Insiders' Interests in the Proposed Transaction**

54.     WildHorse insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and WildHorse's public stockholders.

14

55.    Notably, two WildHorse directors have secured positions for themselves as directors of the combined company upon consummation of the Proposed Transaction. According to the October 31, 2018 press release announcing the Proposed Transaction, "WildHorse will designate two individuals, presently expected to be Jay Graham and current WildHorse Director David Hayes to be added to Chesapeake's Board of Directors."

56.    Additionally, Company insiders stand to reap substantial financial benefits for securing the deal with Chesapeake.  If they are terminated in connection with the Proposed Transaction, the Company's named executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation, as set forth in the following table:

|  | Cash ($)(1) | Equity ($)(2) | Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Jay C. Graham | 5,075,655 | 7,179,871 | 65,808 | 12,321,334 |
| Anthony Bahr | 5,075,655 | 6,789,763 | 65,808 | 11,931,226 |
| Andrew J. Cozby | 2,528,055 | 6,253,174 | 54,840 | 8,836,069 |
| Steve Habachy | 2,528,055 | 3,906,503 | 54,840 | 6,489,398 |
| Kyle N. Roane | 2,528,055 | 6,253,174 | 54,840 | 8,836,069 |

**The Proxy Statement Contains Material Misstatements and Omissions**

57.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to WildHorse's stockholders.   The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction.

58.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information concerning: (i) WildHorse's and Chesapeake's financial projections relied upon by the Financial Advisors in their analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Financial Advisors; (iii) the background process leading to the Proposed Transaction; (iv) potential conflicts of interest faced by the Company's financial advisors; and (v) Company

insiders' potential conflicts of interest.  Accordingly, WildHorse stockholders are being asked to make a voting decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning WildHorse's and Chesapeake's Financial Projections***

59.     The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

60.     First, the Proxy Statement omits material information regarding WildHorse management's financial projections and the financial analyses performed by the Financial Advisors.

61.     For example, in connection with the Financial Advisors' *Discounted Cash Flow Analyses ("DCF")* of each of WildHorse and Chesapeake, the Proxy Statement sets forth that, "WildHorse's financial advisors calculated the present value, as of October 1, 2018, of the standalone unlevered cash flows expected to be generated by each of WildHorse and Chesapeake, based on the estimates reflected in the WildHorse Company Forecasts."  Proxy Statement at 113.  The Proxy Statement, however, fails to disclose the Company's and Chesapeake's respective unlevered free cash flows ("UFCFs") for 2018 through 2023 based on the respective NYMEX Strip Pricing, Wall Street Consensus Pricing, and 3-Year Historical Average commodity price assumptions and with respect to the Company, for each of the Case A, Case B, and Case C projections.  The Proxy Statement further fails to disclose the definitions of WildHorse's and Chesapeake's UFCFs as well as the line items used to calculate UFCFs, relied upon by the Financial Advisors in their DCFs.

62.     Further, in connection with rendering its fairness opinion, TPH reviewed, among other things, "certain cost savings projected by the management of WildHorse to result from the

merger (the "WildHorse Cost Synergies")." *Id.* at 107. Similarly, in connection with rendering its fairness opinion, Morgan Stanley reviewed, among other things, "information relating to certain strategic, financial and operational benefits anticipated from the merger, prepared by the management of WildHorse (which we refer to as the "WildHorse Synergies")." *Id.* at 110. Yet, the Proxy Statement fails to set forth any synergies prepared by the Company's management and reviewed and relied upon by the Financial Advisors in connection with rendering their fairness opinions.

63. The omission of this information renders the statements in the "Opinion of Tudor Pickering Holt & Co Advisors LP, WildHorse's Financial Advisor," "Opinion of Morgan Stanley & Co. LLC, WildHorse's Financial Advisor," "Summary of Analyses of WildHorse's Financial Advisors," "Certain Chesapeake Unaudited Prospective Financial and Operating Information," and "Certain WildHorse Unaudited Prospective Financial and Operating Information" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Financial Advisors' Financial Analyses***

64. The Proxy Statement describes the Financial Advisors' fairness opinions and the various valuation analyses performed in support of their opinions. However, the descriptions of the Financial Advisors' fairness opinions and analyses fail to include key inputs and assumptions underlying these analyses. Without this information, as described below, WildHorse's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Financial Advisors' fairness opinions in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to WildHorse's stockholders.

65.     With respect to the Financial Advisors' *DCFs* of each of WildHorse and Chesapeake, the Proxy Statement fails to disclose: (i) WildHorse's and Chesapeake's respective UFCFs utilized by the Financial Advisors in their analyses; (ii) quantification of the inputs and assumptions underlying the discount rates ranging from 8.0% to 10.0%; (iii) the basis for applying EBITDAX multiples ranging from, in the case of WildHorse, 3.5x to 5.5x, and in the case of Chesapeake, 5.0x to 7.0x to derive the companies' terminal values; (iv) WildHorse's and Chesapeake's respective net debt; and (v) the implied perpetuity growth rates resulting from the analyses.

66.     With respect to the Financial Advisors' *Net Asset Value Analysis*, the Proxy Statement fails to disclose: (i) the future cash flows expected to be generated by each of WildHorse's and Chesapeake's assets through the end of their economic lives; (ii) the UFCFs used in the analysis; (iii) quantification of the inputs and assumptions underlying the discount rates ranging from 8.0% to 10.0%; and (iv) the value of each of the (a) cash flows generated by the estimated proved reserves, unproved reserves and undeveloped hydrocarbon resources, (b) future estimated effects of hedging, (c) future estimated effects of general and administrative expense and income taxes, (d) net debt and (e) in the case of Chesapeake, the Chesapeake preferred stock.

67.     With respect to the Financial Advisors' *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for each of the selected transactions analyzed by the Financial Advisors.

68.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

69.     The omission of this information renders the statements in the  "Summary of Analyses of WildHorse's Financial Advisors," "Certain Chesapeake Unaudited Prospective Financial and Operating Information," and "Certain WildHorse Unaudited Prospective Financial and Operating Information" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

70.     The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

71.     For example, in connection with the sale process, the Proxy Statement states that ". . . Mr. Graham contacted the Chief Executive Officer of Company B to inquire whether Company B would be interested in a strategic combination with WildHorse.  The CEO acknowledged that Company B would be interested in such a discussion and both companies executed a mutual confidentiality agreement on July 13, 2018."  Proxy Statement at 81.  The Proxy Statement further sets forth that:

> Beginning on October 2, 2018, at the direction of WildHorse, the WRD Financial Advisors contacted four publicly traded, independent exploration and production companies (including Company A) identified by WildHorse and the WRD Financial Advisors as most likely to be interested in, and able to execute on, a strategic combination with WildHorse given the location of their existing assets and their financial capabilities.

*Id.* at 85.  The Proxy Statement fails, however, to expressly indicate whether the Company entered into confidentiality agreements with any of the parties contacted beginning on October 2, 2018, and if so, whether these confidentiality agreements, as well as the confidentiality agreement executed by Company B, are still in effect and/or contain "don't ask, don't waive" standstill provisions that are presently precluding these parties from making a topping bid for the Company.

19

72.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Potential Conflicts of Interest Faced by the Company's Financial Advisors***

73.     The Proxy Statement fails to disclose material information concerning potential conflicts of interest faced by the Company's financial advisors.

74.     For example, the Proxy Statement sets forth that:

> TPH has previously provided services to WildHorse, The Carlyle Group L.P. ("Carlyle") (which owned approximately 24% of the WildHorse common stock on an as-converted basis as of the date of TPH's opinion), Carlyle's majority-controlled affiliates and portfolio companies (collectively, the "Carlyle Related Entities"), NGP (which owned approximately 44% of the WildHorse common stock as of the date of TPH's opinion) and NGP's majority-controlled affiliates and portfolio companies (collectively, the "NGP Related Entities") on unrelated matters for which TPH has received compensation during the two years prior to the date of TPH's opinion, including serving as an underwriter in connection with WildHorse's initial public offering in 2016. In the two years prior to the date of TPH's opinion, TPH and its affiliates received aggregate fees in connection with such services of approximately $600,000 from WildHorse and less than $2,000,000, in the aggregate, from Carlyle, the Carlyle Related Entities, NGP and the NGP Related Entities. TPH may in the future provide investment banking or other financial services to WildHorse, Chesapeake, any of the other parties or their respective affiliates (including Carlyle, NGP, the Carlyle Related Entities and the NGP Related Entities). In connection with such investment banking or other financial services, TPH may receive compensation. In addition, TPH, its affiliates, directors or officers, including individuals working with WildHorse in connection with the merger may have committed and may commit in the future to invest in private equity funds managed by Carlyle or NGP.

*Id.* at 109.  However, the Proxy Statement fails to disclose any services TPH and its affiliates have provided to Chesapeake, and the amount of compensation TPH and its affiliates received for such services.

75.     Similarly, in connection with the Board's decision to engage Morgan Stanley as a financial advisor, the Proxy Statement states that "Morgan Stanley had previously served as a

financial advisor in a past similar transaction involving WildHorse management and several members of the WildHorse board." *Id.* at 83.  Yet, the Proxy Statement fails to set forth the nature of the services Morgan Stanley performed for WildHorse and the members of the Board, as well as the compensation Morgan Stanley received for such services.

76.     Additionally, the Proxy Statement fails to disclose the terms of Guggenheim's engagement, including the amount of compensation Guggenheim received or will receive in connection with its engagement and whether Guggenheim has provided past services to any parties to the Merger Agreement or their affiliates, as well as the timing and nature of such services and the amount of compensation received by Guggenheim for such services.

77.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

78.     The omission of this information renders the statements in the "Opinion of Tudor Pickering Holt & Co Advisors LP, WildHorse's Financial Advisor," "Opinion of Morgan Stanley & Co. LLC, WildHorse's Financial Advisor" and "Background of the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

79.     The Proxy Statement also fails to disclose material information concerning potential conflicts of interest faced by WildHorse insiders.

80.     For example, the Proxy Statement sets forth:

Subsequent to the execution of the merger agreement, there have been discussions between WildHorse and Messrs. Graham and Bahr regarding certain transition matters. In connection with these discussions, WildHorse may enter into new agreements with Messrs. Graham and Bahr that will remain effective after the closing of the merger. However, at this time there is no assurance that any

21

discussions between the parties will result in any new agreements or, if so, what the terms and conditions of any such agreements would be.

*Id.* at 138.  The Proxy Statement, however, fails to set forth whether any discussions regarding continued employment for WildHorse executive officers occurred *prior* to execution of the Merger Agreement, and if so, when they occurred and their content.  The Proxy Statement further fails to disclose whether any of Chesapeake's prior proposals or indications of interest mentioned management retention in the combined company or the purchase of or participation in the equity of the surviving corporation.

81.   Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

82.   The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

83.     Plaintiff repeats all previous allegations as if set forth in full.

84.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

85.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  The Proxy Statement misrepresented and/or omitted material facts, including material information about (i) WildHorse and Chesapeake's financial projections relied upon by the Financial Advisors in their analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Financial Advisors; (iii) the background process leading to the Proposed Transaction; (iv) potential conflicts of interest faced by the Company's financial advisors; and (v) Company insiders' potential conflicts of interest.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

86.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate

disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

87.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

88.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

89.     Plaintiff repeats all previous allegations as if set forth in full.

90.     The Individual Defendants acted as controlling persons of WildHorse within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of WildHorse and participation in or awareness of the Company's operations or intimate knowledge of the statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

91.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

93.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

94.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

95.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of WildHorse, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction

and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to WildHorse stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: January 17, 2019                                    **WEISSLAW LLP**

Richard A. Acocelli
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010
Email: racocelli@weisslawllp.com

*Attorneys for Plaintiff*


**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
Email: fortunato@bespc.com

*Attorneys for Plaintiff*